United States District Court
Southern District of Texas
**ENTERED**
December 20, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIM. ACTION NO. 5:24-CR-811** |
| | § | |
| **CONCEPCION GERARDO** | § | |
| **PALOMARES** | § | |

## MEMORANDUM & ORDER

Before the Court is Defendant Concepcion Gerardo Palomares' Motion to Dismiss Count I of the Indictment, (Dkt. No. 31).

Relevant to this Order, Palomares was indicted for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). (Dkt. No. 14 at 1). He moves to dismiss this charge as unconstitutional under the Commerce Clause and the Second Amendment. (Dkt. No. 31 at 2). The felony conviction which serves as the predicate offense for the charge against Palomares under § 922(g)(1) is transportation of an undocumented alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Judgment at 1, *United States v. Palomares*, No. 2:21-CR-690-001 (S.D. Tex. Dec. 2, 2021), ECF No. 29.

### I.   Commerce Clause

First, Palomares challenges 18 U.S.C. § 922(g)(1) as an unconstitutional extension of congressional power under the Commerce Clause. (*Id.* at 3). Section 922(g)(1) makes it illegal for anyone who has been convicted of a felony to "possess in or affecting commerce, any firearm." Palomares seems to bring both a statutory and constitutional argument, (Dkt. No. 31 at 3), arguing that § 922(g)(1) cannot apply so broadly to include every firearm that has ever passed through interstate or foreign commerce and that, if it did, it would exceed Congress's power.

The Government contends that this argument is foreclosed by Fifth Circuit precedent. (Dkt. No. 32 at 2). Palomares concedes as much. (Dkt. No. 31 at 3). Because the parties agree that this argument fails, there is no need to analyze the issue at length. Suffice to say that the Fifth Circuit disregarded these statutory and constitutional arguments before. *United States v. Rawls*, 85 F.3d 240, 242 (5th Cir. 1996). The Fifth Circuit has subsequently upheld this reasoning and found Palomares' argument is

foreclosed. *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013); *United States v. Jones*, 88 F.4th 571, 573 (5th Cir. 2023); *United States v. Bennett*, No. 23-10081, 2023 WL 6878909, at \*1 (5th Cir. Oct. 18, 2023). Accordingly, this challenge to § 922(g)(1) is **DENIED**.

## II.   Second Amendment

The Supreme Court has held that the right to bear arms is "fundamental . . . to our system of ordered liberty." *McDonald v. City of Chi.*, 561 U.S. 742, 778 (2010). However, like other rights, the right to bear arms "is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

In *Bruen v. New York State Rifle & Pistol Association*, the Court adopted a new methodology for courts to use when ruling on these challenges. 597 U.S. 1, 17 (2022). First, if "the Second Amendment's plain text covers an individual's conduct," the Second Amendment "presumptively protects that conduct." *Id.* Then, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* To meet this burden, the Government must show historical analogues between the modern regulations and historical precedent. *See id.* at 26–27. However, the government must only show a "historical *analogue*, not a historical *twin*." *Id.* at 30 (emphasis in the original). When analyzing potential analogues, courts should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Court clarified this standard in *United States v. Rahimi*, emphasizing that the challenged regulation need not be a "'dead ringer'" of the offered historical precedent. 144 S. Ct. 1889, 1898 (2024) (quoting *Bruen*, 597 U.S. at 30).

In *United States v. Diaz*, the Fifth Circuit considered an as-applied Second Amendment challenge to § 922(g)(1). 116 F.4th 458 (5th Cir. 2024). In determining whether any historical analogues sufficiently supported disarming the defendant under the Second Amendment, the Court first considered how states punished similar crimes at the time of the Founding. *Id.* at 467. Since crimes similar to those committed by the defendant, namely theft, were severely punished in the founding-era, he could be dispossessed of his firearms. *Id.* at 468. The court then analyzed Bruen's "central considerations": how and why these regulations burden an individual's right to self-defense. *Id.* at 469. The court found that § 922(g)(1) was sufficiently analogous to other

founding-era laws that worked to prevent dangerous individuals from possessing firearms, namely through allowing the death penalty for most felonies. *Id.* Since permanent disarmament is a lesser sentence than death, the punishment is allowed. *See id.* However, the court noted that the defendant's status as a felon could not, by itself, justify disarming him. *Id.*

Palomares argues that § 922(g)(1) is unconstitutional both facially and as-applied. (Dkt. No. 31 at 7). However, he acknowledges that his facial challenge is foreclosed and only makes the claim to preserve it for future review. (*Id.*); *Diaz*, 116 F.4th at 471–72.

The Court now turns to Palomares' as-applied challenge. Palomares argues that § 922(g)(1) cannot be constitutionally applied to him because there is no analogous founding-era law that would dispossess a person of their firearms based on the predicate offense of transporting aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). (Dkt. No. 31 at 7–8).

The Second Amendment covers the conduct prohibited by § 922(g)(1), so the burden shifts to the Government to show that a historical analogue justifies this penalty. *Bruen*, 597 U.S. at 26–27. It is noted that the Government does <u>not</u> argue in this case that Palomares' predicate felony offense of transporting aliens makes him a danger to the community, such that he can be disarmed consistent with the historical analogues of colonial-era surety laws or "going armed" laws. *See, e.g.*, *Diaz*, 116 F. 4th at 470–71 (finding that "[g]oing armed" laws are relevant historical analogues to § 922(g)(1)). Instead, the Government argues that the modern crime of transporting aliens is sufficiently analogous to early laws that banned smuggling people into the United States to make them slaves and laws that later banned the international slave trade altogether. (Dkt. No. 32 at 5).[1] Because the Government limits itself to arguing these historical analogues in this case, the Court will likewise limit its analysis. Ultimately, the Court determines that the Government has failed to meet its burden because differences

---

[1] The Court recognizes that the Department of Justice is preserving the argument "that firearms statutes like those in 18 U.S.C. § 922(g)(1) are constitutional in all their application and are not susceptible to as-applied challenges." (Dkt. No. 32 at 3). While the Court believes this is a more well-reasoned approach to the as-applied challenges being raised across the country to the application of § 922(g)(1), this Court is constrained to consider Soliz's as-applied challenge and the analytical framework set forth by the Fifth Circuit Court of Appeals in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024).

between the historical laws criminalizing the slave trade and the modern crime of transporting aliens under § 1324(a)(1)(A)(ii) are too significant.

First, the Government points to founding-era laws that prohibited the slave trade by penalizing those who brought individuals into the United States. (Dkt. No. 32 at 5); Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2228 (2021) (surveying founding-era laws which prohibited bringing kidnapped people into the country as slaves). The Government contends that the slave trade is analogous to transporting aliens because it involves bringing individuals into the United States. Yet, Palomares' conviction under § 1324(a)(1)(A)(ii) does not involve bringing aliens into the country. Instead, it involves transporting undocumented aliens *within* the United States.

To be convicted under § 1324(a)(1)(A)(ii), the Government must prove that a person—knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of the law—transports, or moves or attempts to transport or move such . . . alien within the United States with intent to further the alien's unlawful presence. 8 U.S.C. § 1324(a)(1)(A)(ii). The bringing of an alien into the country is not an element of a crime under § 1324(a)(1)(A)(ii). A slightly better analogy would be a conviction under 8 U.S.C. § 1324(a)(1)(A)(i), which prohibits persons from bringing aliens *into* the country. The bringing of aliens into the United States is not an element of Palomares' predicate felony. Therefore, a key part of the Government's analogy fails because the bringing of persons into the country is a key aspect of every founding-era example the Government cites. (Dkt. No. 32 at 5).

Further, if the transporting of aliens within the United States really was analogous to the slave trade, the person could still be charged for the federal law of trafficking slaves, not simply transporting aliens. Transporting individuals for purposes of forced labor and slavery continues to be a crime under federal law. *See* 18 U.S.C. §§ 1589, 1590. These statutes clearly are analogous to—if not the actual successors of—founding-era statutes prohibiting the slave trade. The crime of transporting aliens does not include many of the core aspects of the slave trade, such as kidnapping and forcing victims into a lifetime of forced labor. To the contrary, transporting aliens within the United States generally involves aliens who have voluntarily entered or remained in the country and have paid for the service of being transported. *See, e.g.*, *In re Nunez-Ramirez*,

4 / 6

No. M–13–746, 2013 WL 6273961, at *7 (S.D. Tex. Dec. 3, 2013) ("[I]in the vast majority of cases involving alien smuggling, transporting, or harboring, the undocumented aliens are voluntary participants in the crime by seeking the services of smugglers who will assist them in entering the United States illegally.").

Finally, the slave trade was and is considered to fall within the category of the worst crimes someone could commit. The Government acknowledges that the slave trade was historically considered akin to piracy. (*Id.*). At the time of the founding, pirates were considered *hostis humani generis*, or enemies of all mankind, and as such, they could be punished by any country. Eric S. Kobrick, Note, *The Ex Post Facto Prohibition and the Exercise of Universal Jurisdiction Over Int'l Crimes*, 87 Colum. L. Rev. 1515, 1520–21 (1987).  Congress added slave trading to this category, noting that slave traders should be treated as *hostis humani generis*. Tara Helfman, *Marauders in the Courts: Why the Federal Courts Have Got the Problem of Maritime Piracy (Mostly) Wrong*, 62 Syracuse L. Rev. 53, 60 n.31 (2012).

Under this doctrine, slave trading, like piracy, was and is a crime of universal concern which, under international law, any nation can punish. Restatement (Third) of the Foreign Relations Law of the United States § 404 (Am. Law. Inst. 1987). This category of crimes later expanded to include war crimes, crimes against humanity, and genocide. *Id.* Slave trading, therefore, has historically been considered one of the most serious crimes a person could commit under both domestic and international law. Transporting aliens in violation of § 1324(a)(1)(A)(ii) is not akin to such crimes.

The Government seems to hinge its analogy on the immigration aspects of the slave trade, emphasizing that prohibitions on it necessarily prohibited bringing certain people into the country and that the law allowed for victims to be deported. (Dkt. No. 32 at 5–6). But this misses the mark. The Government's cabined view of the slave trade merely as an immigration crime overlooks the harsh reality of injustice and violence wrought upon its victims. The crime of slave trading was not based on simply bringing people into the country illegally but instead was based on kidnapping free people, transporting them against their will to a foreign country, and forcing them to work against their will. *See United States v. The Amistad*, 40 U.S. 518, 596 (1841). The inherent nature of the slave trade sets it apart from the crime of transporting aliens under § 1324(a)(1)(A)(ii). While there are some similarities between Palomares' predicate

5 / 6

offense and the proposed historical analogue, the distinctions are too significant to make it an appropriate historical analogue.

In this case, the Government has not met is burden under *Bruen* and *Rahimi* to show a relevant historical analogue to constitutionally apply § 922(g)(1) to Palomares.

### III.    Conclusion

Based on the foregoing, Defendant's Motion to Dismiss Count I of the Indictment, (Dkt. No. 31), is **GRANTED**.

It is so **ORDERED**.

**SIGNED** on December 20, 2024.

_____
John A. Kazen
United States District Judge

6 / 6